```
          IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF OHIO
                      EASTERN DIVISION


Tammy Tarbert,                    :

        Plaintiff,                :

     v.                           :   Case No. 2:14-cv-2450

                                  :   JUDGE MICHAEL H. WATSON
Commissioner of Social Security,      Magistrate Judge Kemp

        Defendant.                :
```

## REPORT AND RECOMMENDATION

### I.  Introduction

Plaintiff, Tammy Tarbert, filed this action seeking review of a decision of the Commissioner of Social Security denying her application for supplemental security income.  That application was filed on July 18, 2011, and alleged that Plaintiff became disabled on July 1, 2011.

After initial administrative denials of her claim, Plaintiff was given a hearing before an Administrative Law Judge on May 22, 2013.  In a decision dated July 19, 2013, the ALJ denied benefits.  That became the Commissioner's final decision on September 30, 2014, when the Appeals Council denied review.

After Plaintiff filed this case, the Commissioner filed the administrative record on February 2, 2015.  Plaintiff filed her statement of specific errors on April 9, 2015, to which the Commissioner responded on June 30, 2015.  No reply brief has been filed, and the case is now ready to decide.

### II.  The Lay Testimony at the Administrative Hearing

Plaintiff, who was 40 years old at the time of the administrative hearing and who graduated from high school, but in LD classes, testified as follows.  Her testimony appears at pages 43-65 of the administrative record.

Plaintiff first testified that she had trouble reading big words. She completed her application forms on her own but had trouble with them.

The last time Plaintiff worked was about five years before the hearing. She delivered papers for the Mount Vernon News. That was a part-time job. Before that, she worked installing wires into circuit breaker boxes. That was a full-time job, but she held it only about seven months.

Plaintiff said she was being treated for bipolar disorder, and had been receiving mental health treatment for about twelve years. She just recently began counseling again. About a year and a half before the hearing, she had surgery for a herniated esophagus. Plaintiff said she had frequent blackout spells as well but was never told why and received no treatment for them.

Plaintiff's bipolar disorder caused daily mood swings, causing her to be angry or to cry. Night terrors interrupted her sleep every night. During the day, she used a computer to visit Facebook and play games, and she watched television. She was able to fix meals for herself and her mother and to drive to the store or to doctors' appointments. She socialized only with her family. Large groups of people made her nervous. She thought that fear of crowds was what kept her from working. Plaintiff said she also was having some back problems and was going to see a doctor about that condition.

### III. The Medical Records

The medical records in this case are found beginning on page 314 of the administrative record. The Court will summarize those records, as well as the opinions of the state agency reviewers, to the extent that they are pertinent to Plaintiff's statement of error.

The first record of mental health treatment submitted in connection with Plaintiff's current application (she had

previously applied unsuccessfully for benefits) appears to be a note dated August 27, 2008. That note states that the treatment objectives were to decrease her depression and anxiety and to achieve mood stability. Plaintiff had decided to move to Zanesville to help care for her stepfather. At her intake assessment, she had been diagnosed with bipolar disorder. Additional counseling notes from 2008 through 2010 show that as of December 24, 2008, Plaintiff was not taking medications. The diagnoses at that time included not only bipolar disorder but OCD and possibly ODD. The note commented that Plaintiff "has many difficulties getting along with people and acting within systems." (Tr. 326). She was given a prescription for Tegretol. Dr. Kahn saw her for medication management after that. In a note dated May 20, 2009, he commented that Plaintiff was "doing all right" but she had run out of lithium and that she was somewhat depressed and moody as a result. Her mood was depressed but her appearance, behavior, speech, and thought processes were normal. (Tr. 323-24). She was still "doing all right" when he next saw her in July, 2009, and she was satisfied with her medication, although she asked Dr. Kahn to write a note to the Ohio Department of Job and Family Services "about her disability." (Tr. 322). The note mentioned that Dr. Kahn had given her a note "proclaiming her to be completely and permanently disabled, or for at least 6 months...." A note from March 24, 2010, did not show much change, nor did notes from later that year. A note from January 26, 2011 stated that Plaintiff "continues well" and that she was stable and satisfied with her medication. (Tr. 447). Progress notes from 2012 and 2013 from her counselor and from Dr. Kahn are much the same.

    Dr. Weaver performed a consultative examination on May 12, 2010. He mostly tested and reported on physical restrictions (he thought she could do light to moderate lifting and carrying) but

also said that he saw no evidence of mental difficulties. (Tr. 336-40).

Afterwards, Plaintiff was sent to see Floyd Sours, a consulting psychologist. He conducted an evaluation on October 27, 2011, reporting that Plaintiff said she suffered from depression, anxiety, and bipolar disorder with mood swings. She described four suicide attempts but none in the past five years, and no psychiatric hospitalizations. She exhibited a minimal range of emotion and reported poor concentration, loss of interest, unpredictable mood swings, and interpersonal difficulties. Her days consisted of taking her dogs out, caring for herself, watching television, preparing meals, and eating. She had no hobbies and did not report socializing with any friends. Mr. Sours diagnosed bipolar disorder and rated her GAF at 59 in terms of symptom severity and 61 in terms of functional severity. He believed she could remember and carry out instructions in a work setting, could concentrate and persist on simple, repetitive, and multi-step tasks, could maintain socially acceptable behavior for up to a year, and might quit under work pressure as that pressure built up over time. (Tr. 559-63). Dr. Reece had performed a similar evaluation in 2006 in connection with a prior application and reached much the same conclusions, noting that Plaintiff's mental ability to withstand the stress and pressure of regular work activity was moderately to severely impaired. (Tr. 688-92). Other documents submitted in connection with that application included a note from a treating source, Dr. Nadolson, to the effect that Plaintiff was capable of working (Tr. 687), another note showing that Dr. Kahn began treating Plaintiff in 2005 when Dr. Nadolson left the practice and that she reported deterioration in her condition in the past few months, and notes showing that she was "doing alright in general" (e.g. Tr. 681) or "a lot better," Tr. 680. There were also notes

showing that she was affected by a number of family situations such as the death of her fiancé and the illness of her stepfather.

Dr. Kahn said in a functional capacity report that he signed on January 27, 2012, that, based on the twelve years during which he said he had been treating Plaintiff, she had impaired concentration and memory, and suffered from "definite," "considerable," or "severe" impairments in the areas of following directions, maintaining attention, and sustaining concentration. (Tr. 565-67).  He also filled out a mental capacity assessment form on April 25, 2013, indicating that Plaintiff had marked limitations in, among others, the areas of maintaining concentration and attention for extended periods, keeping a schedule, completing a workday or work week without interruption from psychologically-based symptoms, and setting realistic goals or making plans independently of others.  (Tr. 637-39).

Finally, Dr. Lewin, a state agency reviewer, assessed Plaintiff's mental capacity, reporting on June 22, 2010, that she was adopting a prior residual functional capacity finding that Plaintiff could perform simple, routine, repetitive tasks in a relatively static, non-crowded environment with not more than occasional superficial contact with others.  (Tr. 369).  Dr. Haskins, another state reviewer, did the same (Tr. 79), as did Dr. Waggoner (Tr. 93-94).

### IV.  The Vocational Testimony

Gene Burkhammer, a vocational expert, testified at the administrative hearing.  His testimony begins at page 65 of the administrative record.

Mr. Burkhammer began by testifying about Plaintiff's past relevant work.  He said that, according to records he reviewed, Plaintiff worked as a cashier in 1997 and 1998, a job which was light and unskilled, and in the production assembly field, also

performing light unskilled work.

Mr. Burkhammer was then asked to answer some questions about a hypothetical person who could do light work and who was limited to simple, routine, repetitive tasks in a low-stress environment involving only occasional decision-making and only occasional changes to the work setting. He or she also could have only brief and superficial interaction with the public and with coworkers. According to Mr. Burkhammer, such a person could do Plaintiff's past work as a production assembler but not as a cashier. Such a person could also work as a housekeeping cleaner, mail clerk, food service worker, or office assistant. However, if the person would be off task 15% of the time on a consistent basis, he or she could not be employed. The same was true for someone who consistently missed more than two days of work per month.

V. The Administrative Law Judge's Decision

The Administrative Law Judge's decision appears at pages 13-32 of the administrative record. The important findings in that decision are as follows.

The Administrative Law Judge found, first, that Plaintiff had not engaged in substantial gainful activity since her application date of July 18, 2011.

Going to the second step of the sequential evaluation process, the ALJ determined that Plaintiff had severe impairments including bipolar disorder, post-traumatic stress disorder, mood disorder, obsessive-compulsive disorder, and degenerative disc disease. The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1), including sections 12.04 and 12.06.

Moving to step four of the sequential evaluation process, the ALJ found that Plaintiff had the residual functional capacity

to perform work at the medium exertional level.  She was limited to the performance of tasks which were simple, routine, and repetitive in nature and which could be performed in a low-stress environment defined as requiring only occasional decision-making and only occasional changes to the work setting.  Finally, she was limited to occasional interaction with the public and coworkers, so long as that contact was brief and superficial.

The ALJ found that, with these restrictions, Plaintiff could not perform her past relevant work as a retail cashier.  However, the ALJ concluded that she could work as a housekeeper cleaner, mail clerk, food service worker, and clerical assistant, and that these jobs existed in significant numbers in the region, the State, and nationally.  Consequently, the ALJ decided that Plaintiff was not entitled to benefits.

### VI.  Plaintiff's Statement of Specific Errors

In her statement of specific errors, Plaintiff raises a number of issues in the introductory paragraph (Doc. 11, at 1), but argues only a single issue.  She asserts that the ALJ erred in his analysis of the treating source opinion rendered by Dr. Kahn.  This issue is considered under the following legal standard.

Standard of Review.  Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'" Id.  LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole.  Harris v. Heckler, 756 F.2d 431, 435

(6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985). Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence. Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

It has long been the law in social security disability cases that a treating physician's opinion is entitled to weight substantially greater than that of a nonexamining medical advisor or a physician who saw plaintiff only once. 20 C.F.R. §404.1527(c); see also Lashley v. Secretary of H.H.S., 708 F.2d 1048, 1054 (6th Cir. 1983); Estes v. Harris, 512 F.Supp. 1106, 1113 (S.D. Ohio 1981). However, in evaluating a treating physician's opinion, the Commissioner may consider the extent to which that physician's own objective findings support or contradict that opinion. Moon v. Sullivan, 923 F.2d 1175 (6th Cir. 1990); Loy v. Secretary of HHS, 901 F.2d 1306 (6th Cir. 1990). The Commissioner may also evaluate other objective medical evidence, including the results of tests or examinations performed by non-treating medical sources, and may consider the claimant's activities of daily living. Cutlip v. Secretary of HHS, 25 F.3d 284 (6th Cir. 1994). No matter how the issue of the weight to be given to a treating physician's opinion is finally resolved, the ALJ is required to provide a reasoned explanation so that both the claimant and a reviewing Court can determine why

the opinion was rejected (if it was) and whether the ALJ considered only appropriate factors in making that decision. Wilson v. Comm'r of Social Security, 378 F.3d 541, 544 (6th Cir. 2004).

Plaintiff asserts that the ALJ erred in two respects when he did not give controlling or significant weight to Dr. Kahn's opinions.  She claims both that the record does not support that evaluation, and that the ALJ did not properly articulate his reasoning.  The Court begins its analysis by reviewing in detail what the ALJ actually said about the opinions in question.

The ALJ devoted several pages to reviewing all of Dr. Kahn's treatment notes and observations, along with the consultative examiners' reports.  Before engaging in a direct discussion of Dr. Kahn's opinions, the ALJ concluded that "the generally mild mental health findings contained in the record and documented improvement with medication indicates that greater functional limitation that what is set forth [in the ALJ's decision] is not warranted ...."  (Tr. 26).  The ALJ also found that Plaintiff's activities of daily living "detract[ed] from her allegations of totally disabling mental and physical impairments" and he described such activities as driving, watching television, playing computer games, using social media, shopping for groceries, preparing meals, and helping to care for her mother. Id.

As far as the opinion evidence is concerned, the ALJ began by discussing the three state agency opinions about Plaintiff's mental functional capacity.  He gave them great weight as being "consistent with the record as a whole, which indicates some ongoing symptoms of mental impairment, including a mildly depressed and subdued mood and affect, but otherwise intact memory and cognition, and normal thought processes and speech."  (Tr. 28).  He gave great weight to Mr. Sours' opinion for the same reasons.  On the other had, he gave little weight to Dr.

-9-

Kahn's views, noting that they were inconsistent with the record as a whole, including the same summary of the record which was used in connection with the evaluation of the state agency reviewers.  The ALJ also criticized the second of Dr. Kahn's opinions for failing to provide any narrative of objective findings to support it and its inconsistency with his own examination findings.  (Tr. 29).

As to the articulation requirement found in 20 C.F.R. §416.927(c), Plaintiff argues that "the ALJ did not adequately explain his reasons for discounting Dr. Kahn's opinions."  Doc. 11, at 9.  In support of that argument, she contends that the ALJ did not adequately explain his conclusion that the record does not support Dr. Kahn's opinions and "fails to even mention the length of time that Dr. Kahn has treated the Plaintiff."  Id.

Taking this latter point first, the ALJ summarized every treatment note from Dr. Kahn, beginning with the June 7, 2005 note (Tr. 683).  He clearly was aware of the length of the treating relationship, and also noted the times when Plaintiff had a gap in treatment.  Additionally, "there is no requirement that the ALJ address each of the §404.1527(c) factors in her opinion."  Machiele v. Comm'r of Social Security, 2014 WL 4080240, *1 (W.D. Mich. Aug. 18, 2014).  The articulation requirement found in §404.1527(c)(and its counterpart regulation, §416.927(c), which applies to SSI cases) is satisfied if the ALJ's decision is "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  SSR 96-2p.  The failure to mention in so many words that Dr. Kahn had been treating Plaintiff since 2005 (and not for twelve years, as Plaintiff contended) is not an articulation error.

Further, the ALJ's thorough detailing of Dr. Kahn's records, and his characterization of them as showing only mild findings

and documented improvement with medication, is sufficiently specific to allow the Court to understand the basis for the ALJ's decision.  This is not a case where there are a myriad of treatment records and the ALJ makes no effort to specify which, if any, of those records are consistent or inconsistent with a treating source opinion.  Cf. Oblinger v. Comm'r of Social Security, 2012 WL 1340360, *7 (S.D. Ohio Apr. 18, 2012), adopted and affirmed 2012 WL 1656992 (S.D. Ohio May 10, 2012)(holding that the use of conclusory language which could be used in any case is not sufficient to satisfy the articulation requirement applicable to treating source opinions).  Since that did not occur here, the only remaining issue is whether the reasons which the ALJ articulated for discounting Dr. Kahn's opinions find substantial support in the record.

    The Court concludes that they do.  Clearly, the ALJ was strongly influenced by the fact that Dr. Kahn's own notes, from 2005 forward, demonstrated few abnormal signs or findings and showed that Plaintiff's condition was exacerbated when she had some family issues or when she ran out of medication, but improved and stabilized when she was receiving treatment on a regular basis.  Plaintiff contends that Dr. Kahn was in a better position than the ALJ to interpret his own findings, but the state agency reviewers and consultative examiners (to the extent they had access to Dr. Kahn's notes) interpreted them differently also.  The Commissioner correctly points out that inconsistencies between treatment notes and opinions is a proper basis for an ALJ to discount the opinions of a treating source.  See, e.g., Goodman v. Astrue, 2012 WL 293152, *10 (S.D. Ohio Feb. 1, 2012), adopted and affirmed 2012 WL 931390 (S.D. Ohio Mar. 19, 2012), citing Render v. Sec'y of Health & Human Servs., 1989 WL 34104, *3 (6th Cir. Apr. 3, 1989).  That has been applied specifically to psychiatric treatment notes.  See, e.g., Wilkerson v. Comm'r of Social Security, 2013 WL 6387810, *11 (S.D. Ohio Dec. 6,

2013), adopted and affirmed 2014 WL 1338112 (S.D. Ohio Apr. 2, 2014), where the Court held that "[t]he ALJ adequately explained why [the treating source]'s clinical records (reflecting relatively mild to moderate symptoms and a 'stable' condition) were often inconsistent with the psychiatrist's extreme disability opinions ...." See also French v. Comm'r of Social Security, 2014 WL 4594784, *7 (N.D. Ohio Sept. 15, 2014)("it is clear that an ALJ is permitted to treat different portions of a medical source statement differently, so long as good reasons for doing so are provided").

    Consequently, while it is true that Dr. Kahn treated Plaintiff for a long period of time, it is also true that he sometimes saw her only once or twice a year (and in some years, not at all), and that her presentation to him was mostly normal. She clearly experienced events which made her condition worse at times, but that usually happened when she ran out of medication or had not been in for treatment.  His descriptions of her as stable, improving, doing well, and satisfied with her medication, as well as the opinions from other mental health professionals indicating that there are work settings which would be available for someone with her psychological limitations, constitute evidence from which a reasonable person could conclude that Plaintiff was not as restricted as Dr. Kahn believed.  That being so, the ALJ did not commit any error justifying a reversal or remand.

### VII.  Recommended Decision

    Based on the above discussion, it is recommended that the Plaintiff's statement of errors be overruled and that judgment be entered in favor of the Defendant Commissioner.

### VIII.  Procedure on Objections

    If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those

specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a de novo determination of those portions  of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

                                                /s/ Terence P. Kemp
                                                United States Magistrate Judge